The next matter on our calendar is United States v. Jerome Shaw. You may proceed. Oh, well, we'll wait till the opposing counsel is there. Good morning, Your Honors. May it please the Court. My name is John Burke. I'm the attorney for defendant-appellant Jerome Shaw. Mr. Shaw was indicted in the Southern District with four counts of criminal activity. Conspiracy to transport stolen property, transporting stolen property, receipt and sale of stolen goods, and interstate transportation of a stolen car. He pled guilty to all those counts. He admitted that he drove a car from Connecticut to New York. He admitted he sold stolen property, coins that were taken from a burglary in Connecticut, sold them to a pawnbroker in New Jersey. He admitted that he had stolen property in his house. He denied tying people up, cutting holes in the walls of various residents. He denied being at the scene of 14 out of the 16 burglaries involved. He admitted that he was at the scene of two of them. He took place on the same day. What's the standard of review for material developed at a Fatico hearing? Now, I wish it was beyond reasonable doubt, but the Court knows it's not, Judge. It's a clearly erroneous standard, and it's the burden of preponderance of the evidence. Preponderance of the evidence. That's right. That's all you need. But in this case, I'm sorry, Judge. No, go. Continue. They didn't even have that. Now, the first thing, if you look at it, there's no forensic evidence connecting Mr. Shaw with these 14 burglaries. Other than the property in his house. But that's big. The property in his house is big. Oh, it's a big, certainly. There's no question we have the property, Judge. Doesn't mean he did the burglaries. That's the real issue here. And what it shows is there's no forensic evidence showing that, no DNA, footprints, fingerprints, toll records, phone records showing that Mr. Shaw was at the scene of these burglaries. Did not have it. Did not have one witness who testified that Mr. Shaw was at the scene of these burglaries. The court relied upon, for its ruling, evidence that Mr. Shaw had done burglaries 13 years ago in Nassau County. Had done a burglary, attempted burglary, excuse me, in New Jersey. Where he had burglarous tools, he's arrested. What about the witness, though, who testified? Excuse me? What about the witness who testified, Edinger? What about his statements to the police? His testimony was significant and important to Mr. Shaw. And let me tell you why. Mr. Edinger was the pawnbroker. Had a felony record. Made false receipts. Said he got stolen property over the years from Mr. Shaw. Admitted he didn't know if Shaw was doing burglaries or not. But what he said was, this is significant, he talked about the modus operandi, right? The court relied on this, too. The modus operandi laid out by Mr. Edinger was that Mr. Shaw would cut holes in a residence, wait there for the people to come in, tie them up, and make them open the safes. That was the M.O. And, Your Honors, most importantly, that M.O. doesn't match any of the 16 burglaries. Of the 16 burglaries, 14 of them, nobody was home. 14 of them, nobody's home. In those cases, they took the safes and opened them at their leisure somewhere else, correct? Excuse me? In those cases, they took the safe instead of waiting for someone to open it in the house. They took the safes with them. Out of the 16 burglaries, there were two safes. All right? So there's really, again, out of the one incident, the one burglary where somebody was tied up with neckties, that witness testified at the trial, not trial, the fatigal hearing, Mrs. Faragi, and she did not identify Mr. Shaw. Just stick with Mr. Edinger now. Was he wearing a mask? Yes. That's one of the things that the government purports was M.O. And it's our contention that to a large extent, these things are generic. Wearing masks, having dark clothing, having burglar's tools. This is what burglars do. And to show also why these 16 burglaries didn't match the M.O. laid out by Mr. Shaw, there was just a great variation in them. Ten of them. So Mr. Shaw is resisting the government's evidence on all these things, and you're, you know, continuing those arguments here. Why is he entitled to acceptance of responsibility credit, then? I think it's guideline commentary to 3E1.1. You can contest things in your probation report. You can contest what could be relevant behavior, but it doesn't mean you're contesting it in a fatigal hearing. It doesn't mean that it's frivolous or false. There was no proof putting Shaw at the scene of these burglaries. A second witness who testified. Does anyone – wouldn't your argument suggest that anyone taking a plea deal, then, is entitled to acceptance of responsibility? Just the elements, and then anything else beyond that they can resist. No, that's not my contention, Your Honor. That's not my contention. My contention is if you make a good-faith objection to findings in the pre-sentence report, and you lose. It has to be good faith? Is that the crux of it here? Well, actually, I think the test is it can be as long as it's not frivolous, right? That's what the guideline commentary says, as long as it's not frivolous or false. And one other quick thing here before I get to rebuttal time. There was another – now, no one – Ettinger didn't testify. And Mr. Smith, another person, they played his videotape statement. He testified. The government put that tape in. He said he was a nephew of Mr. Shaw. Didn't really have a relationship with him. Never did a burglary with him. Heard he was a robber. That's what he heard. Also, what's significant is Mr. Shaw is arrested in Greenwich, Connecticut, doing a burglary with free men. He's got masks. He's got burglar's tools. That burglar was arrested. This fellow, Mr. Smith, was arrested while Mr. Shaw is in custody. So burglaries are continuing in Greenwich, Connecticut, by masked men, with burglar's tools, while Mr. Shaw is in jail. The police said there were two different groups doing burglaries. Now, there's a lot of evidence here, but it doesn't point to Mr. Shaw. It's our contention the government just did not meet their burden at the Fatico hearing. And Shaw – this is point two in our brief. Speak into the microphone. Excuse me? Speak into the microphone. Okay. Shaw pled guilty to all the counts in the indictment. Without a plea agreement. No plea agreement. They wouldn't give us one. He pled guilty to all the counts in the indictment, and he ends up getting 15 years, way, way higher than what his sentence would have been. We contend that the proper guidelines were 100 to 125. But you know the district court is free to consider so-called relevant conduct? I'm sorry, Your Honor? You know the district court is free to consider relevant conduct? Absolutely. The court is given great deference in these matters. Correct. Except when the court's wrong. That's our position. The court was wrong in this instance, Judge. There was no proof showing that Mr. Shaw had tied people up, had cut those holes. And I think it's very important, as you can see, the government's position changed at a certain point. At one point they were calling Mr. Shaw an active participant. Then after the fatical hearing and in their appellate brief, they say he was either an active participant or an organizing force, a mastermind. The reason why they shift is because there's really no proof that he was there at the scene. They didn't meet their burden of proof on the fatical hearing. He should have gotten acceptance of responsibility. He should not have had a two-level increase for tying people up at a burglary, which he was ‑‑ there's no evidence he was there, that he did it. And when that witness testified, they didn't identify him. Forgive me for going over a buzzer. No, thank you. You have reserved some time for rebuttal. Sure. You have five minutes, and you'll still have that. Let's hear from the government. May it please the Court, my name is Dominic Gentile. I'm an assistant United States attorney in the Southern District of New York. I represent the government on appeal, and I represented the government before the District Court. Good morning, Your Honors. With the Court's permission, I'm going to turn first to Mr. Burke's argument regarding the District Court's factual findings. The District Court's factual findings were not clearly erroneous, as they must be for this Court to disturb those findings. In fact, just the opposite is true. In finding that Schor participated in the 16 residential break-ins that were at issue in the Fatico hearing, Judge Sullivan was well within his discretion to conclude that the defendant either participated in these break-ins or was involved in the planning or execution of those break-ins. Judge Sullivan had before him an overwhelming amount of circumstantial evidence. Such as? Such as, in addition to Mr. Schor's admitted role in the two burglaries on November 14th of 2015, Judge Sullivan also had video-recorded statements from two of Schor's associates, Scott Ettinger, who was the fence to whom Schor sold his ill-gotten goods, and his own nephew, Eric Smith, both of whom spoke at length about Schor's burglary activities. In fact, Ettinger provided very specific details about his modus operandi, about how Schor gained entry into these homes using that modus operandi that was strikingly similar to the 16 break-ins that occurred in Connecticut. Although it sounds to me that it was kind of generic, as opposing counsel has said. You break into the house, you take the stuff, right? You've cut a hole in the door, and then you take the stuff. What is so unique to Mr. Schor in that plan? I'm happy to answer that, Your Honor. Good. To put it in perspective, of the 16 break-ins, six involved cutting a hole in the side of the home, a door of the home, or the rear of the home, using a cutting tool or a saw of some kind. The other, another seven burglaries included gaining access to a second-floor window or French door in the rear of the home using a ladder. There were really only two ways to get into these 16 homes. And this was all to avoid the alarms. The cutting the holes in the side of the homes or in the doors of the homes was to avoid setting off the alarms. Going to the rear of the houses on the second floor, we believe, or the police believed it was a crime of opportunity, where they would take advantage of either an open window or an unlocked French door. On certain occasions, when they went to the second-floor landing, they had to pry their way in through a window or through a French door. Those are two different, I mean, modus operandi, aren't they? I'm sorry, what's that, Judge? Those are two different modus operandi methods, I guess. Well, there are some differences between the two, absolutely. But the fact that those 16 break-ins were all conducted in one of those two manners is significant. I mean, it's significant because on November 14, 2015, the two burglaries that Mr. Shaw admits to participating in, which he has to admit to participating in them, and the reason is because he left a car parked on the property. With his driver's license in it. With his driver's license in it, with a fingerprint of his on the rear-view mirror, and with tools in the back that included a ladder, that included cutting tools, that were consistent with either gaining entrance to a second-floor landing or cutting a hole in the side of a house. I would also point out for the Court that testimony was offered at the FATCO hearing regarding some of Shaw's prior convictions for burglary. One of those prior convictions included climbing onto a second-floor landing of a home out in Old Westbury, where he was caught in the act trying to cut a hole in the home. Another burglary conviction that he sustained in Long Island, in connection with that arrest, was one in Old Westbury again, where he and a fellow, a co-defendant, broke into a home, held the two people in the home hostage until, at gunpoint, robbed them of their belongings and left. Those were two crimes he was convicted of previous to the 16 break-ins in Connecticut. It's very relevant, the fact that he used the same M.O. in 1998 as he did from 2011 to 2015. What about the burglary that occurred while the defendant was in custody? How can we hold him responsible for that one? We're not asking the Court to hold them responsible for that, Your Honor. What Mr. Burke was referring to was Eric Smith, who was caught by Greenwich police with several other, I won't say co-defendants because he wasn't charged, but he was caught with several other people in a car with burglar's tools. They were stopped for investigation. They were questioned, and that's when the video-recorded statement that was offered at the FATCO hearing was taken. We're not saying that Shaw was participated in or was involved in that attempted burglary in any way. All we're saying is that these 16 break-ins, of which we have substantial proof, which includes, and again, to put it in perspective for the Court, of the 14 homes that were broken into, I'm sorry, of the 14 homes where property was removed, 44 items that were stolen from those homes, that were stolen from 11 of those homes, was recovered from the defendant's home, was seen in the defendant's home, or was recovered in the car the defendant used. Well, he claimed he was a fence. That would be consistent with him having the material from the robberies, even if he didn't do the robberies. It would be, except for the fact that his associate, Scott Ettinger, gave the police a fairly detailed account of how Shaw committed burglaries. His own nephew told the police that Shaw was involved in burglarizing homes. We also have the previous convictions where he, Shaw, participated in very similar types of offenses, which he pled guilty to, I might add. I have a question about acceptance of responsibility credit. How much can a defendant contest at a FATICO hearing without losing that credit? I'm sure you're not arguing that he has to accept everything. Certainly. I think what's at issue here, Your Honor, is that the relevant conduct of which the district court found all of these 16 burglaries or break-ins was integral to the charged offenses. So here he would have had to accept responsibility for everything the government alleged relating to the 16 offenses? To the extent that we proved it by a preponderance of the evidence, yes, he would have to accept responsibility for that. But I think the salient point, for the district court at least, was that they were comprised of the charged offenses. And it's also important to point out, for Your Honors, that one of the charged offenses was a conspiracy to commit interstate transportation of stolen property. From December 2011 to November 2015, the exact time frame that these 16 break-ins occurred. But what if it was flipped? I mean, what if he said instead of two out of the 16 he was involved with, what if he said I was involved in 14, but these other two really I wasn't? Would that be enough? Would that be enough to deny the acceptance points? Yes. I would think it would be, Your Honor, because he would be, again, according to the sentencing guidelines, he would be falsely denying this relevant conduct. And we're not getting – we're not arguing the point that it was frivolous. What we're saying is that this was a false denial of at least, in Your Honor's scenario, of at least two. We submit that all 16 he falsely denied. Any false denial or denial where, in the face of preponderance of the evidence, would be sufficient to lose the credit for accepting responsibility? Any false denial of relevant conduct would be sufficient to deny the acceptance points, yes. Unless the Court has any other questions, the government will rest on its submission. Thank you. Thank you. Mr. Burke, you reserve two minutes for rebuttal. Two minutes. Now, they talked about the holes that were put in these walls or doors, right? The testimony at the Fatico hearing indicated the holes were much too small for Mr. Shaw to get through. He's 6'2", 6'3", 250 pounds. And the genesis of this Fatico hearing was the probation report saying Mr. Shaw cut the holes, Mr. Shaw went into the houses, Mr. Shaw did the burglaries. That's where this thing started. The holes were too small. Now, what this really boils down to, to a large extent, is they're seeing a pattern where there is no pattern. They have the witness saying that this is Mr. Ettinger on a tape saying that he puts holes in the walls, he waits for people to come home, then he gets them. That never happened. Fourteen out of 16 of these burglaries, no one's home. One of them, with it tied up, he's not identified. The other one, which I didn't mention before, I don't think, the other one, the homeowner hears that the burglaries are outside. He says, who's there? They run away. There is no M.O. What we have here is an unsavory set of facts. What we have here is a man with a prior record. And we have here a position where you could think that maybe Mr. Shaw could have done this. But that's not a preponderance of the evidence. I mean, here is an assumption. It's substance and it's underlying here. Once a burglar, always a burglar. He must have done it. Now, when they had evidence showing he was at the scene, he admitted it. The reason why there was no evidence for the other burglaries that he was there is because he wasn't there. We respectfully disagree with the district court's findings. Thank you. Thank you, counsel. Thank you both. We'll reserve decision.